GREELY (WILKINSON v.). See Cases Nos. 17,671 and 17,672.

## Case No. 5,751.

### In re GREEN.

[7 Biss. 338; [1] 15 N. B. R. 198.]

District Court, W. D. Wisconsin. Jan. 19, 1877.

GAMING CONTRACTS — NOTES VOID FOR WANT OF CONSIDERATION.

1. Contracts of sale that do not contemplate the actual bona fide delivery of the property by the seller, nor the payment by the buyer, but are intended to be settled by paying the difference in price at some future time are gambling contracts, and the broker stands in no better position than the seller to recover differences.

[Cited in Third Nat. Bank v. Harrison, 10 Fed. 249; Ward v. Vosburgh, 31 Fed. 15.]
[Applied in Barnard v. Backhaus, 52 Wis. 604, 6 N. W. 252, and 9 N. W. 595.]

2. If there is no legal liability to pay a claim, notes given therefor are void for want of consideration. Various cases cited and commented upon.

[Cited in Clarke v. Foss, Case No. 2,852.]
[Cited in Justh v. Holliday, 2 D. C. 353; Whitesides v. Hunt, 97 Ind. 196.]

[In bankruptcy. In the matter of John Green.]

H. M. Lewis, for assignee.
Gregory & Pinney, for creditors.

HOPKINS, District Judge. Richard Green proved a claim of $7,715.16 against the bankrupt's estate, and James Norris of $1,877.23. The assignee moves to expunge Norris' claim and to reduce Green's. The grounds upon which the motion is made are, that the contracts upon which the claims are based were void, first, by the statute of frauds, and second, that they were gaming contracts. In the view I have taken of the case, it is only necessary to consider the latter. There has been considerable testimony taken, and it is in some respects quite contradictory, but I think the conflict is more apparent than real. The proof shows that the part of the claim of Richard Green which is objected to, and all

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

of Norris' claim, arose out of losses on wheat contracts, and it is claimed that no wheat was in fact bought or intended to be bought, but the transactions were only purchases of options—wagers on the price of wheat at a future day, and void under the statute of this state on the subject of betting and gaming. Taylor's St. p. 1881, § 16. If the contract for the purchase and sale of wheat was only colorable and neither party intended to deliver or accept the wheat, but only to pay differences according to the rise and fall of the market price, it would be a gaming contract and void. The form of the contract would not be conclusive. Courts would look into the matter and determine whether the parties really meant to purchase and sell, or whether the transaction was but a mere bet upon the future price of the article. This must be determined by the evidence and circumstances attending the making of the contract and the conduct of the parties in reference to it. The form of the contract would not control or be very material if the transaction itself was illegal. Add. Cont. (Cave's 7th Ed.) p. 209; Pickering v. Cease [79 Ill. 328]; Kirkpatrick v. Bonsall, 72 Pa. St. 155; Cassard v. Hinman, 1 Bosw. 207; Grizewood v. Blane, 73 E. C. L. 526, 20 Eng. Law & Eq. 290; Rourke v. Short, 25 Law J. Q. B. 196; Enderby v. Gilpin, 5 Moore, 571. The court in 72 Pa. St. 155, after stating that gambling must not be confounded with mercantile speculation, for that is proper, says, "merchants speculate upon the future price of articles in which they deal, and buy and sell accordingly. They forecast the future and buy and sell in a bona fide way, which is unobjectionable. But," (the court says) "when ventures are made upon the turn of price only, with no bona fide intent to deal in the article, but merely to risk the difference between the rise and fall at a future time, the case is changed. No money or capital is invested in the purchase, but so much only is required as will cover the difference or margin as it is figuratively termed. The bargain represents not a transfer of property but a mere stake or wager upon its future price. * * * Such transactions are destructive of good morals and fair dealings, and of the best interests of the community."

Against such transactions the statute is aimed, and when they are proven, the parties must in this state be left without remedy. They are unlawful and void as contravening a sound public policy as well as the statute of the state. Our statute has gone further than the English statutes on this question; ours makes void all agreements and contracts to pay money lost on a wager either to the party winning or to a party who advances it to aid in the enterprise. It is unlawful to bet and equally so to lend money for that purpose. No cause of action arises in favor of a party to an illegal transaction nor will the law lend its aid to enforce any contract which is in conflict with the terms of a stat-

ute or a sound public policy or good morals. Ruckman v. Bryan, 3 Denio, 340; Armstrong v. Toler, 11 Wheat. [24 U. S.] 258; Hooker v. Knab, 26 Wis. 511.

It has also been held that where a stakeholder pays over the money to a winner by the direction of the loser after the bet is decided that it will not prevent a recovery back of him by the loser. Ruckman v. Pitcher, 1 N. Y. 392. Having ascertained the law applicable to such transactions, the question recurs upon the evidence: Did the bankrupt intend or mean to deal in the property, or only pay the difference in price at a future day? If the latter, the contract within the decisions above referred to is void.

It is insisted that both the claimants acted as agents only for the bankrupt in buying, and were not the parties selling, so that, conceding the rule of law to be as above stated, they do not fall within it; that they paid the money to the parties selling to the bankrupt, and although the purchase was made through them as agents of the bankrupt in the usual way of trade, and with knowledge of the illegal nature of the contract, still the bankrupt is liable to them for money paid to third parties for the differences, and that it is in the nature of a claim for money paid at his request, and is not within the prohibition of the act. Reliance was placed upon the case of Rosewarne v. Billing, 109 E. C. L. 316, to sustain this claim. That was an action by a broker to recover of his principal money paid by him for differences on illegal contracts for the purchase of shares of railroad stock made by the broker for the principal. The court say that no action could be maintained to recover the differences on such time contracts, but that when such losses were paid by a party at the request of the defendant, such party could recover. The court hold that such contracts are void, but not illegal, and not being illegal, a party paying at the request of the defendant could recover. But this is not the doctrine of the courts of this country. They hold them to be illegal; they say they are unlawful as in conflict with sound morals and public policy as well as inhibited by the statute. But this is not all. Our statute is broader than the English statute. The statute of this state declares all contracts, notes or agreements for reimbursing or repaying any money knowingly advanced for any betting or gaming at the time or place of the gaming or betting to be void. These parties, it seems to me, fall within that statute. They advanced the margins at the time to make the gaming contract, and without their aid in that respect the contracts would not have been made. So if these contracts are gaming contracts, they must be held to have advanced the money for margins to make them. and their claim for repayment falls within the prohibited class mentioned in the act. They made the illegal contracts and advanced the money re-

quired to give them colorable validity. To take their case out of the statute would be establishing a most flagrant evasion of its provisions.

If the bankrupt had requested a party to pay the difference for him after the loss, and such party had not been an actor, nor aided or assisted in the unlawful dealings out of which the loss grew, there would be some reason in allowing him to recover. He would be an innocent party. Jessopp v. Lutwyche, 10 Exch. 614. In such a case the consideration would not, as to him, be illegal; he would not be chargeable with the act declared to be illegal. But here the statute, as before stated, declares all promises or notes to repay money advanced at the time and place, void. The money here was advanced at the time and place. The contracts of purchase were in the names of these claimants. Their claims are not for money loaned to the bankrupt to pay differences, but for money paid by them for differences and for which the bankrupt was not liable.

The case of Steers v. Lashley, 6 Term R. 61, very closely resembles this. That was an action on a bill of exchange by an indorsee with knowledge of the consideration. In that case the defendant had engaged in several stock jobbing transactions in which Wilson was employed as his broker and had paid the differences. Wilson drew the bill for a part of those differences, which defendant accepted; it was then indorsed to the plaintiff but with knowledge of the facts. Lord Kenyon before whom the case was tried ordered nonsuit. A motion to set it aside was made on the ground that as the broker had paid the difference for his employer, which was the consideration, the bill was not vitiated by the original transaction, citing Faikney v. Reynous, 4 Burrows, 2069, and Petrie v. Hannay, 3 Term R. 418. Lord Kenyon denied the motion, and said that in the cases referred to, the money had been loaned to pay the difference, and afterwards the securities were given for the money so loaned. "But here (he said) the bill on which the action is brought was given for the very differences which Wilson could not enforce payment of himself," and as the plaintiff took the bill with knowledge he occupies no better position.

If the law was correctly stated in that case, it settles the question that a broker who transacts the illegal business, and pays the differences, cannot recover of the principal the money thus paid; a proposition so clear to my mind that it would hardly seem necessary to quote authority to sustain it. But, plainly as it appears, the case of Rosewarne v. Billing, supra, cited by the claimant's counsel, seems to sanction a different doctrine. But I do not think that case can be regarded as the law upon this point in England. There are cases in conflict with it, so I think it may be safely asserted that the weight of English authorities is with Steers v. Lashley, supra.

If transactions like these are illegal I know of no reason why the broker should be favored, or exempted from the usual consequences that attach to other parties aiding or assisting in the commission of unlawful acts. It makes their business quite hazardous, but that grows out of its illegal character. They can refuse to aid in transactions of such a character, and if they would do so, a great deal of that kind of gambling would stop. Parties like this bankrupt living in the country without means or privileges upon the exchange boards could not embark in such gambling business without their aid. Through brokers and commission men they get access to the exchange boards, and by reason of such facilities are enabled to engage in these gaming contracts which generally end like this, in ruin and bankruptcy.

To their complaint of hardship it is a sufficient answer that they should not aid and assist parties in transactions condemned both by the law and the principles of sound morality. If they do, they must take the consequences like other transgressors.

Having ascertained that contracts of sale that do not contemplate the actual bona fide delivery of the property by the seller nor the payment by the buyer, but are intended to be settled by paying the difference in price at some future time, are held to be gambling contracts and that the broker stands in no better position than the seller to recover differences, it only remains to examine the testimony and see whether the contracts in this case were such. And upon this point I do not intend to go over the testimony in detail. It is self evident from the testimony and the condition of the parties that these sales were not bona fide. The bankrupt was not a dealer in grain. He was a country merchant of little or no means; had no money to invest in wheat, that is to pay for wheat, which fact both Richard Green, his brother, and Norris knew. The idea that they bought for him several thousand bushels of wheat with the expectation that he was to pay for it is preposterous. He swears they did not and it is apparent that he could not, and they knew it.

He did not put up any money even for margins, or but a small amount, if any, and made no arrangements with them to do so. Norris says the wheat was bought for him in their firm name. That probably may have been so in the sense that term is used "on change," but that there was a bona fide purchase, with the intention that he would take and pay for such large quantities of wheat I do not believe. The purchase it is claimed was made in the name of Norris & Spencer, the brokers, not the bankrupt's, and that they had a number of contracts and perhaps some warehouse receipts for grain is quite probable, and that they might have considered such contracts as the property of the

bankrupt, and charged the wheat to him on their books on receiving his order to buy, so as to make a colorable sale, is not improbable, but that they expected payment for the whole, the testimony completely negatives. The fact that the parties charged the bankrupt with the price of the grain when he ordered it purchased and credited him with the price sold for, when sold, does not prove what the real transaction was. That only represents the form, not the nature of the transaction. It was as well to keep the account in that way when the real intention was to speculate in and pay only the differences as when the sale was of the article itself. The books would show the differences if it was to pay them, and the profit or loss if it was a genuine sale. The books were properly kept in either case, and do not therefore furnish any evidence as to what the contract was.

But it is said that the bankrupt settled with Norris, and gave him notes, and that these notes are good, if the account was not. That is not so. If there was no legal liability on the part of the bankrupt to pay the claim, the notes given therefor are void for want of consideration. This point is expressly ruled by the supreme court in Hooker v. Knab, 26 Wis. 511. See, also, Steers v. Lashley, 6 Term R. 61. The question whether the bankrupt could have defended on this ground as against a bona fide holder of the notes, does not arise here, as the original parties are alone before the court. The claim of Norris is therefore invalid, and his proof is rejected.

As to Richard Green's claim, the pretended contracts of purchase were made in his name, and not in the name of the bankrupt, and the testimony shows that as between them, all that either ever contemplated was the payment of differences. Under the evidence this is too plain to admit of question or discussion. His claim so far as such differences on grain contracts, are included, is disallowed and the proof is rejected. But as there are some other items of account that are proper and should be allowed, it will be referred to the register to take and admit proof of such other items. The motion of the assignee to expunge the proof of such parties is therefore granted.

Consult Ex parte Young [Case No. 18,145]; also, Clark v. Foss [Id. 2,852].